UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                 Case No. 1:25-cr-100

v.

                                 Hon. Hala Y. Jarbou

LEO CHARLES BERRY,

     Defendant.

_____/

## **OPINION**

Defendant Leo Charles Berry has been charged with being a felon in possession of firearms, including a .40 caliber Glock 23 semi-automatic pistol and a .40 caliber Glock 35 semi-automatic pistol. He moves the Court to suppress evidence obtained by police officers when searching his vehicle at a traffic stop in Benton Harbor, Michigan, on July 27, 2024. A passenger who fled from Berry's vehicle dropped a firearm on the ground. A subsequent search of the vehicle led to the discovery of two additional firearms. He is charged with possessing two of these three firearms. When arresting Berry at the traffic stop, officers seized two cellphones that he was carrying and obtained a warrant to search them. After executing that warrant, officers discovered additional evidence of Berry's possession of the firearms. Berry asks the Court to suppress the evidence of the firearms discovered at the traffic stop as well as the evidence recovered from the cellphones.

On June 16, 2026, the Court held a hearing on the motion to suppress evidence from the traffic stop. FBI Special Agent Ben Glynn testified for the Government. The Government also presented video of the traffic stop taken from police body cameras and a dash camera. After reviewing the evidence, the Court will deny Berry's motions to suppress.

**I. FACTS**

**A. Traffic Stop**

At the motion hearing, Glynn testified that he is a member of a task force led by the FBI that focuses on violent gang and gun crime in the Benton Harbor area.  The task force includes officers from the Benton Harbor Department of Public Safety and the Michigan State Police.  Late in the evening on July 26, 2024, and into the early morning of July 27, 2024, the task force was conducting surveillance on a large house party taking place in Benton Harbor.  A confidential informant known to Glynn reported seeing two men wearing ski masks walking from a black Chevy Tahoe with tinted windows toward the party.  The informant said that one of those men was carrying a handgun concealed in his waistband.  The man carrying the firearm was wearing a black top and black pants.  The other man (later determined to be Berry) was wearing a basketball jersey. Glynn judged this information to be credible because the informant had provided reliable, corroborated information to Glynn throughout the two years Glynn had worked with them.  Glynn relayed this information to the task force.

Glynn traveled to the area and saw the Chevy Tahoe parked about a block or two south of the party.  He observed two men matching the descriptions provided by the informant walking away from the Tahoe toward the party.  They were wearing the clothing described, including the ski masks.[1]  Officers checked the license plate on the Tahoe and determined that the vehicle was registered to Berry and that it did not have electronically-verified insurance.  (*See* LEIN Report, ECF No. 58-10.)  Glynn also observed the dark tint on the front driver's side and passenger side windows, which was a violation of Michigan law.  *See* Mich. Comp. Laws § 257.709(1)(a).

---

[1] The ski masks were unusual because it was a "very warm" evening, according to Glynn.  Also, Berry's outfit was somewhat unique in that Glynn did not see anyone else wearing a basketball jersey at or around the party that evening.

Glynn and the task force officers kept an eye on the Tahoe.  About an hour and fifteen minutes after Glynn arrived at the scene, a task force officer saw several individuals enter the Tahoe and pull away.  Glynn was told that one of those individuals, dressed all in black, entered the rear portion of the vehicle.  The Tahoe traveled north and eventually parked on the side of the road about a block from where it started.  Detective Kinzler pulled up behind the Tahoe in his police cruiser and activated his police lights to initiate a traffic stop.  (*See* Dashcam Video 02:36:38, Gov't Ex. 3, ECF No. 58-3.)

Glynn says he ordered the stop due to the lack of verified insurance on the vehicle, the illegally tinted windows, and his concern that an occupant of the vehicle was unlawfully carrying a firearm.  Michigan law makes it unlawful for an individual to carry a pistol "concealed on or about his or her person," or "in a vehicle operated or occupied by" the carrier, without a license to do so.  Mich. Comp. Laws § 750.227(2).

Due to concerns about the possible presence of an armed individual inside the vehicle, Kinzler approached cautiously from the back of the Tahoe on the driver's side as Officer Smith approached from the back on the passenger side.  (Dashcam Video 02:37:05.)  Berry, who was seated in the driver's seat wearing a basketball jersey, rolled down his window partway and gave a document to Kinzler.  (*Id.* 02:37:54.)  A few minutes later, about five minutes into the stop, a woman in the front passenger seat showed Smith proof of insurance for the vehicle.  (Smith Bodycam Video 02:41:16, Gov't Ex. 4, ECF No. 58-4.)  At that same moment, Kinzler had Berry step out of the car while Glynn watched.  (*Id.* 02:41:24; Dashcam Video 02:41:24.)

Kinzler spoke to Berry while the two of them were standing behind the Tahoe.  (Dashcam Video 02:42:46.)  Glynn heard Berry say that he had arrived only five minutes earlier and that he

was looking for a place to park, which seemed to contradict what the task force officers had seen.[2] As Kinzler turned back to the vehicle to focus on the other occupants, he and Glynn told Berry to stay put. (*Id.* 02:42:56.) But Berry did not comply. He tried to follow Kinzler to the side of the Tahoe, so Glynn and another officer intervened to stop him. They put handcuffs on Berry and directed him to a police cruiser. (*Id.* 02:43:20.) According to Glynn, he smelled alcohol on Berry at this point, which led him to believe Berry had been drinking. An officer frisked Berry and then had him sit on the back seat of the cruiser, but Berry refused to pull his feet into the vehicle despite repeated directions to do so. (Officer 1 Bodycam Video 02:45:06–46:15, Gov't Ex. 8, ECF No. 58-12.)

There were four other individuals still inside the Tahoe, including the man dressed in all black clothing, who was seated in the third row. According to Glynn, standard police procedure is to remove the occupants of a vehicle one by one. For safety reasons, they did not want to bring anyone else out of the Tahoe until they had Berry under control. Also, because they suspected that there was an armed individual inside the vehicle, they did not want to question anyone about that particular issue while the occupants were still inside. Alerting an armed individual that police were aware of the firearm would potentially give that person reason to use his firearm on the officers while surrounded by innocent passengers who could get caught in crossfire.

Shortly after pulling Berry away from the Tahoe, the officers had Shaquille Burton step out of the vehicle. Burton had been seated directly behind the driver's seat and was wearing a red sweatshirt. (Dashcam Video 02:46:01.) Kinzler patted Burton down. According to Glynn, Kinzler felt a handgun in Burton's waistband. This discovery apparently prompted Burton to flee;

---

[2] In the video, Berry can be heard saying "I was gonna park and go to the party. . . .  I just got here." (Dashcam Video 02:41:40–54.)

he ran away.  (*Id.* 02:46:21.)  Several officers chased him and recovered a discarded firearm along his flight path.[3]  (Officer 2 Bodycam Video 02:51:40, Gov't Ex. 9, ECF No. 58-14.)

After Burton fled, an officer took Berry's cell phones from him.  (Officer 1 Bodycam Video 02:47:08.)  Berry repeatedly asked for his phones back.  (*Id.* 02:47:43–56.)  While the chase for Burton was ongoing, Berry also tried to flee and was caught within seconds.  (*See* Smith Bodycam Video 02:48:10–21.)  The officers arrested him.

After clearing everyone out of the Tahoe, the officers searched it and discovered two more handguns:  one in the center console by the driver's seat and another on the floor in front of the third row.  The police did not impound Berry's vehicle.  Instead, Berry gave the keys to one of his companions who later drove the vehicle to her home.

### B. Seizure and Search of Phones

When arresting Berry, officers seized the two cell phones he had been holding.  In August 2024, Glynn applied for a warrant to search the phones.  (Appl. for Search Warrant, ECF No. 73-1.)  In the search warrant affidavit, Glynn described the circumstances surrounding the traffic stop and Berry's arrest.  Glynn also indicated that a confidential informant had conducted a series of controlled purchases of fentanyl from Berry between December 2023 and April 2024.  (Warrant Aff. ¶ 7, ECF No. 73-1.)  During "at least 12" of the purchases, the informant placed a phone call to Berry at one of two phone numbers.  (*Id.*)  The informant spoke to Berry on the phone to request the fentanyl.  (*Id.*)

Glynn also described how, after Berry attempted to flee and was placed under arrest, he asked a female passenger in the Chevy Tahoe to "come get my phones."  (*Id.* ¶ 15.)

---

[3] This firearm is apparently one of the two that Berry is charged with possessing.

Berry argues that the police improperly seized his phones before arresting him.  He also contends that Glynn made false or misleading statements in the search warrant affidavit, rendering the search warrant invalid.

## II. LAW

Berry challenges the legality of the traffic stop and the subsequent search of his vehicle. "The government has the burden of proving the legality of a warrantless search." *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).

Berry also challenges the legality of the seizure of his phones and their search pursuant to a search warrant.  The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ."  U.S. Const. amend. IV.  "To satisfy the Fourth Amendment's warrant requirement, a magistrate issuing a warrant must be satisfied that probable cause exists for a search." *United States v. Ray*, 803 F.3d 244, 275 (6th Cir. 2015).  Berry argues that Glynn made false or misleading statements in the warrant affidavit.  "Under *Franks v. Delaware*, 438 U.S. 154 (1978), 'a search based on a warrant that contains deliberately or recklessly false allegations is invalid unless the remaining portions of the affidavit provide probable cause.'" *United States v. Holmes*, 603 F. App'x 383, 386 (6th Cir. 2015) (quoting *United States v. Charles*, 138 F.3d 257, 263 (6th Cir. 1998)).  The Court applies a "two-part test: '(1) whether the defendant has proven by a preponderance of the evidence that the affidavit contains deliberately or recklessly false statements and (2) whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant.'" *Id.* (quoting *Charles*, 138 F.3d at 263).  The Court looks only at the evidence presented to the magistrate when determining whether it establishes probable cause; here, that means the Court looks at the "four corners" of the affidavit. *United States v. Jackson*, 306 F.3d 299, 306 (6th Cir. 2006).

6

### III. ANALYSIS

#### A. Traffic Stop

##### 1. Initial Stop

Berry argues that the evidence from the traffic stop should be suppressed because officers discovered it after detaining him when they did not have justification for doing so.  In his motion, Berry argues that the initial stop was potentially unlawful because it is not clear whether the task force officers had checked to see if the Chevy Tahoe was covered by insurance or whether they would have seen the tint on the windows that late in the evening.  At the motion hearing, however, the Government provided evidence demonstrating both these facts.  Glynn testified that officers checked the vehicle's license plate.  The Government also provided a copy of the LEIN report showing that the vehicle lacked verified electronic insurance.  The initial stop was lawful based on this suspected violation alone.

Glynn also testified that he could see illegal tint on the vehicle windows.  This evidence provides additional support for the stop.  *See United States v. Shelton*, 817 F. App'x 217, 219 (6th Cir. 2020) ("[A]n officer reasonably suspects a window-tint violation if the officer is 'familiar[ ]' with their state's tint law and 'estimate[s] that [a] vehicle [is] tinted substantially darker than' that law permits." (quoting *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008)).  Here, Glynn testified that Michigan law prohibits window tinting on the driver's window and front passenger's side window, and it permits tinting only up to four inches from the top of the other windows.  And his testimony about the presence of illegal tint is corroborated by bodycam video.  (Smith Bodycam Video 02:38:21 (showing full tint on front passenger window).)

In addition, a known and reliable confidential informant had told Glynn that an individual accompanying Berry was carrying a concealed weapon while the two of them were walking away from the Tahoe wearing ski masks.  About an hour later, an individual like the one identified by

the confidential informant was seen entering the Tahoe.  As discussed above, Michigan law prohibits both carrying a concealed weapon and carrying a pistol in a vehicle without a license. Michigan law also puts the burden on the carrier to demonstrate that they have a license.  Mich. Comp. Laws § 776.20.  Due to this "statutory structure," carrying a concealed weapon or carrying a handgun in a vehicle in Michigan "establishes a prima facie violation of state law."  *United States v. Williams*, 483 F. App'x 21, 27 (6th Cir. 2012).  Consequently, an informant's tip that a vehicle occupant is in possession of a handgun can suffice to establish reasonable suspicion that the occupant is engaged in illegal conduct.  *See id.*

Berry argues that the informant's tip was not sufficiently reliable because the informant did not identify the make, model, or color of the firearm.  But the Sixth Circuit has held that "personal observation of criminal activity" by a confidential informant who "has provided reliable information to the police in the past about criminal activity" can provide sufficient cause to issue a warrant.  *United States v. Allen*, 211 F.3d 970, 971 (6th Cir. 2000).  Here, Glynn testified that the informant reported personally observing the concealed weapon and that the informant had provided reliable information in the past.  Moreover, the informant's information was somewhat corroborated at the scene by the presence of two individuals dressed in the manner described near a vehicle like the kind mentioned by the informant.  These facts were sufficient to establish the informant's reliability.  Thus, the initial stop was lawful on this ground as well.

### 2. Prolongation

Berry argues that, even if the stop was lawful at the outset, the officers unlawfully prolonged it after discovering the proof of insurance.  A traffic stop that is "lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  A traffic stop "must . . . last no longer than is necessary to effectuate the purpose of the stop," and "the

investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).  Consequently, police officers generally may not prolong a traffic stop "beyond the time reasonably required to complete the mission of issuing a ticket for the violation" and to "attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015).  "Authority [to continue the stop] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354.  A traffic stop violates the Fourth Amendment "if it is prolonged beyond the time reasonably required" to issue a ticket for the violation.  *Id.* at 354–55.

As part of a traffic stop, officers may "check[] the driver's license, determin[e] whether there are outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance." *Id.* at 355.  "Context-framing" questions about the driver's "travel history and plans" are also permissible.  *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023).  And police may order a car's occupants to step out of the vehicle while conducting this inquiry. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).  In the course of completing these tasks, officers may investigate matters unrelated to the traffic stop only if additional suspicion arises from the encounter, *Rodriguez*, 575 U.S. at 355, or if such inquiries "do not measurably extend the duration of the stop," *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  In other words, once an officer completes, or reasonably should have completed, the normal tasks associated with the purpose of the traffic stop (e.g., gets the driver's information, checks for warrants and proof of insurance, and issues a ticket), the officer cannot prolong the stop to investigate other criminal activity unless the officer learns new information that gives "reasonable and articulable suspicion that criminal activity is afoot" so as to justify further detention.  *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020).

"Reasonable suspicion requires more than an 'inarticulate hunch,' but less evidence than what is necessary for either a probable-cause or preponderance-of-the-evidence standard." *United States v. Pope*, 852 F. App'x 945, 950 (6th Cir. 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)).  In forming reasonable suspicion, officers may draw on their "experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

Prolongation is a fact-specific inquiry.  The Court must consider the totality of the circumstances surrounding the stop.

Berry argues that the investigation supporting the initial stop ended at approximately 2:41 a.m., when an officer confirmed with one of the vehicle's passengers that there was valid insurance on the vehicle.  Berry contends that it was not reasonable to continue the stop by ordering Berry or any other passengers out of the vehicle.  The Court disagrees, for several reasons.

First, the officers were justified in having Berry step out of the vehicle to investigate and ask questions about the illegal tint on the windows of his vehicle.

Second, due to the informant's tip and the officers' observations matching details of that tip, the officers had reasonable suspicion to believe that an occupant of the vehicle was carrying a firearm in violation of Michigan law.  Further justifying a suspicion of illegal activity here was the fact that Berry and the person wearing all black had been wearing ski masks earlier in the evening, which was odd for that time of year.  Together, these facts gave the officers authority to continue to detain Berry and the other passengers while they completed their investigation into the possible firearm violation.  That investigation would necessarily involve questioning the person seated at

the rear of the vehicle, who matched the description of the masked individual seen carrying the concealed firearm.

After the officers removed Berry from the vehicle, his conduct gave them additional reason to suspect illegal behavior.  He stated he had just arrived at the party and was looking for parking, which appeared to contradict what the task force officers and the informant had observed.  The Sixth Circuit has repeatedly indicated that "dubious travel plans" can be a "strong indicator[] of criminal activity."  *United States v. Howard*, 815 F. App'x 69, 77 (6th Cir. 2020) (quoting *United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016)).  It can suggest that the driver is "hiding the true nature of [his] trip."  *Id.* at 78.  "This factor is more likely to give rise to reasonable suspicion . . . when other circumstances contradict the driver's or passengers' explanations."  *Id.* at 77-78 (citations and quotation marks omitted).  Also, Berry refused to follow the officers' directions.  He repeatedly tried to follow Kinzler despite instructions to remain standing behind the Tahoe, giving Glynn the impression that Berry was attempting to interfere with Kinzler's investigation in order to conceal evidence of criminal activity.

Finally, before the officers were able to complete their investigation into the possible firearm violation by removing and questioning all the passengers, Burton attempted to flee and dropped a firearm, which provided additional justification for extending the stop to investigate that firearm.  And while that flight was taking place, Berry himself attempted to flee, which gave the officers cause to arrest him.  Accordingly, the officers did not unnecessarily prolong the duration of the stop.

### 3. Frisk

At the motion hearing, Berry argued that the police did not have authority to frisk him. Even if he is correct, however, he does not contend that the police discovered any evidence in connection with that search.  The Court will suppress evidence only if it is the "fruits of the agents'

11

unlawful action." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  His objection to the frisk has no bearing on whether the Court should suppress evidence obtained from searching the vehicle or the phones.

### 4. Vehicle Search

Berry argues that the police did not have the authority to search his vehicle.  "The automobile exception allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime." *United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011).  "Probable cause is a 'fluid' standard requiring not 'hard certainties,' but only 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Harris v. United States*, 577 F. App'x 70, 71 (6th Cir. 2014) (quoting *Illinois v. Gates*, 462 U.S. 213, 231–32, 238 (1983)).  And where police have probable cause to search a vehicle for contraband, they can "search . . . the places in which there is probable cause to believe that [the contraband] may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982).

Probable cause existed here.  As discussed, the informant's tip gave the officers reason to believe that someone in the Tahoe was illegally carrying a concealed firearm that they brought into the vehicle.  After stepping out of the vehicle for questioning, Berry engaged in suspicious behavior, including attempting to follow Kinzler despite being instructed to stay behind the vehicle and giving an apparently false explanation of his travel.  And he would not cooperate with the officers by putting his legs inside the police cruiser, ostensibly to give himself an opportunity to escape.  Then Burton attempted to flee while discarding a handgun.  Shortly thereafter, Berry also attempted to flee.  The Sixth Circuit "ha[s] long recognized furtive activity and flight as supportive of probable cause to search a vehicle once it is stopped." *Harris* 577 F. App'x at 72; *Williams v. United States*, 632 F. App'x 816, 823 (6th Cir. 2015) ("[I]f officers have reasonable suspicion of criminal activity, and the suspect flees when the officers attempt to stop him, the officers'

12

reasonable suspicion ripens into probable cause."). Burton's actions indicated that there had been contraband inside the vehicle and Berry's flight suggested there was additional contraband still inside the vehicle. *See United States v. Garcia*, 853 F. App'x 825, 829 (4th Cir. 2021) ("Probable cause [to search a vehicle] exists when a police officer finds contraband on a vehicle's recent occupant," including "a large knife and two sets of brass knuckles"). The discovery of Burton's firearm did not eliminate suspicion of there being at least one additional firearm inside the vehicle because the confidential informant did not give officers specific reason to believe Burton possessed the firearm. Instead, the informant indicated that a person dressed in all black possessed a firearm, and that description matched the individual still seated in the back of the car when Burton fled. In short, considering the totality of the circumstances, the officers had probable cause to believe there was still evidence of illegal conduct inside the vehicle before they conducted their search.

Berry argues that the police should have stopped their search once they discovered the firearm on the floor of the car where the man in black had been sitting. He contends they did not have probable cause to then look in the console of the vehicle, which is where they discovered another firearm. The latter firearm appears to be one of the two that Berry is charged with possessing. But as discussed, Berry's actions and the other circumstances known to the officers at the scene gave them reason to believe that Berry himself (in addition to the passenger at the back) might have been concealing contraband in his vehicle. He had been wearing a mask earlier in the evening alongside the person carrying a concealed firearm, he behaved suspiciously at the traffic stop, he gave apparently false information about his travel history, and then he attempted to flee from his own vehicle. All told, the Government has provided sufficient evidence to establish the validity of the vehicle search.

13

**B. Seizure of Phones**

Berry contends that the police improperly seized his phones while they were detaining him in the backseat of the police cruiser because they lacked probable cause to do so.  Officer Fras took Berry's phones from him about a minute before he fled.  After Berry fled, the officers were authorized to seize his phones incident to his arrest.

Berry does not explain how the temporary seizure of his phones, even if illegal, warrants the suppression of any evidence.  There is no indication that the police uncovered any evidence on the phones while they were in police possession at the traffic stop.  Instead, he asks to suppress evidence obtained from the search of the phones pursuant to the warrant, which occurred after the traffic stop.  Even if the temporary seizure was unlawful, the evidence on the phones was not the fruit of that seizure; that evidence was the fruit of a search conducted after a *lawful* seizure in connection with Berry's arrest.  *See Segura v. United States*, 468 U.S. 796, 805 (1984) ("It has been well established for more than 60 years that evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint[.]'") (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see also United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007) (applying "inevitable discovery doctrine" to permit admission of pager improperly seized during traffic stop because officers would have lawfully seized it during the subsequent arrest).

Berry argues that his arrest does not remove the taint from the improper seizure because the flight that led to his arrest was prompted by that seizure.  He claims he fled because the police seized his phones.  But he provides no authority suggesting that an *illegal response* to a purportedly improper seizure taints a subsequent lawful seizure incident to an arrest for that response.  In other words, Berry's asserted motive for fleeing does not adequately connect the improper seizure before his arrest to the seizure that followed.

14

For similar reasons, the Court is not persuaded by Berry's argument that the Court should suppress evidence from the cell phones because the police improperly detained him in handcuffs during the traffic stop.  Assuming that the use of handcuffs was an improper form of detention during the traffic stop, the evidence from the cell phones is not the fruit of that detention.  Thus, it does not supply a basis for suppressing that evidence.

Accordingly, the Court will examine whether the search of the phones' contents was lawful.

**C. Search of Phones**

Berry argues that Glynn made false or misleading statements when applying for a warrant to search the phones, and that without these statements, the affidavit lacked probable cause.  If Berry is able to make a "'substantial preliminary showing' that specific portions of the affidavit have either material misstatements or omissions," then he is entitled to an evidentiary hearing about the affidavit's veracity.  *United States v. McCarley-Connin*, 148 F.4th 808, 816–17 (6th Cir. 2025) (quoting *Franks*, 438 U.S. at 170).  He must make a "substantial showing that the affiant's statements were intentionally or recklessly false."  *Id.* at 816 (quoting *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003) (emphasis removed)).  Berry fails to make that showing.

First, Berry challenges Glynn's assertion that officers took one of Berry's phones during the traffic stop and that Berry dropped another on the ground for the female passenger to retrieve, giving the impression that Berry did not want the police officers to take possession of his phones.  Berry argues that an officer took *both* of his phones, so he could not have dropped one on the ground.  As an initial matter, Glynn's affidavit is somewhat corroborated by the bodycam video, which shows an officer taking two cellphones from plaintiff and another officer placing at least one cellphone on the hood of a car.  (Officer 1 Bodycam Video 02:50:28.)  As Berry is escorted past that car, he appears to grab the phone (or phones) resting on the hood.  (*Id.* 02:50:30.)  An

15

officer then pulls one phone away from Berry and places it back on the hood, on the side of the car opposite from Berry.  (*Id.* 02:50:31.)  At that moment, Berry appears to pull a different phone out in front of his body, which indicates he was still holding one of the phones.[4]  (Smith Bodycam Video 02:50:31)  Berry then instructs an acquaintance to "get my phones."  (Officer 1 Bodycam Video 02:50:44.)  As he is escorted around the hood of the car past the other side, Berry briefly grabs the phone on the hood.  (*Id.* 02:50:50.)  Before doing so, it appears his hands are empty, which suggests he discarded the one he was still holding.

At any rate, any falsehood about whether Berry dropped a phone on the ground for his acquaintance to retrieve is clearly immaterial.  Even without that fact, the affidavit provides ample support to believe that Berry's phones were used for drug trafficking and would likely contain evidence of that offense.  The assertions that a confidential informant had conducted multiple controlled purchases of fentanyl from Berry from December 2023 to April 2024 and that Berry used two phone numbers to arrange these purchases were sufficient to establish probable cause that both of Berry's phones would contain evidence of drug trafficking and firearms possession.

Moreover, the salient point about dropping the phone on the ground is that Berry did not want officers to take it; instead, he wanted his friend to take control of his cell phones.  But the affidavit provides other indicators of this intent.  He "repeatedly" asked his acquaintance to take his phones (Warrant Aff. ¶ 15).

Berry also contends that the affidavit omitted important details about his conduct after he exited his vehicle.  Glynn avers that Berry "was given instructions to remain [at the rear of the

---

[4] The Government asserts that Berry threw this phone across the hood of the car and into the grass at this point. Although the video does not clearly show Berry throwing the phone, that is the most plausible explanation for the events depicted in the video.  For instance, Glynn reacts after Berry supposedly tosses his phone.  He looks in Berry's direction and then shines his flashlight into the grass by the car.  (Smith Bodycam Video 02:50:32.)  A few seconds later, Berry's acquaintance walks over and picks up an object off the ground per Berry's direction to "get my phone." (*Id.* 02:50:54.)

16

vehicle]; however, he attempted to leave the rear of the vehicle and move toward the front of the vehicle where Officer Kinzler was conducting his traffic stop." (Warrant Aff. ¶ 12.)  Berry argues that the affidavit omits the fact that he "slowly and minimally" followed Kinzler and that he said "my bad, my bad" after realizing that the officers did not want him to move, both of which suggested that Berry was being compliant.  (Def.'s Br. in Supp. of Mot. to Suppress Cell Phone Evidence 18, ECF No. 53.)  Here, Berry has not made a substantial preliminary showing of falsehood because his characterization does not line up with the video.  Berry attempted to follow Kinzler and then Kinzler and Glynn told Berry to remain put.  Berry disobeyed those clear commands, which is the opposite of compliance.  And in any case, Glynn's description of Berry's conduct behind the Tahoe is not material to the probable cause determination.  Its absence would not strip the affidavit of probable cause.

Next, Berry notes that the warrant affidavit mentions him asking a female passenger to get his phones, but he argues the affidavit should have mentioned that he said he wanted his phones in order call his father and his lawyer.  He does not explain how these omissions were misleading or how they would have altered the probable cause finding.  Indeed, though he initially stated that he wanted to use the phones to make a phone call, he later asked his friend to take the phones. Wanting to use the phones is not consistent with asking a friend to take them.  It is more likely that he simply wanted to keep the phones away from the police officers.  Thus, these omissions are immaterial.

Berry also contends that the affidavit makes it seem as though the officers discovered the Glock in the console of his vehicle before he asked his friend to take his cell phones.  The affidavit discusses the discovery of the firearms before it mentions Berry asking his friend to get his phones.

17

But that order of events does not meaningfully alter the probable cause analysis.  It does nothing to undermine the probability that there would be evidence of drug trafficking on the phones.

Berry argues that the drug-trafficking information was too stale to supply probable cause. The affidavit referred to drug trafficking between December 2023 and April 2024, but the warrant issued in August 2024, about four months after that time.  Whether information is too stale to support probable cause rests on several factors, including "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), [and] the place to be searched (mere criminal forum of convenience or secure operational base?)."  *United States v. Greene*, 250 F.3d 471, 480–81 (6th Cir. 2001) (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)).

"Evidence tending to establish the existence of an ongoing criminal enterprise 'will generally defeat a claim of staleness.'"  *United States v. Grooms*, 566 F. App'x 485, 489 (6th Cir. 2014) (quoting *United States v. Abboud*, 438 F.3d 554, 573 (6th Cir. 2006)).  In *Grooms*, for example, there was evidence of drug trafficking at a particular location occurring over the course of several months; the court held that a five-month gap between the last instance of trafficking and the issuance of the warrant to search that location did not render the underlying information stale. *Id.*; *accord Greene*, 250 F.3d at 481 (23-month gap between warrant to search a location and last purchase of drugs at that location did not render information stale because the trafficking had been "continuous and ongoing"); *Abboud*, 438 F.3d at 573 (three-year gap between last instance of repeated bank fraud and issuance of warrant did not render warrant stale).  Likewise, Glynn's warrant affidavit indicated that Berry had been involved in over twelve drug transactions in the course of four months, which is sufficient to establish a continuous criminal enterprise and defeats

18

Berry's claim that the four-month-old information about trafficking was too stale to supply probable cause.

Berry also argues that the warrant affidavit provides no information indicating that the *particular phones* seized were used for drug trafficking. "To justify a search, the circumstances must indicate why evidence of an illegal activity will be found in a 'particular place.'" *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (quoting *Gates* 462 U.S. at 238). "Accordingly, '[t]he affidavit must establish a nexus between the place to be searched and things to be seized, such that there is a substantial basis to believe that the things to be seized will be found in the place searched.'" *Id.* (quoting *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010)). The warrant affidavit here supplied that basis. It indicated that Berry used two different phone numbers for drug trafficking activity. When police detained Berry at the traffic stop, he possessed two cell phones. The phones to be searched were the ones taken directly from Berry. His possession of those phones indicates that he used them. Thus, it was reasonable to infer that those phones were the same ones he had used for drug trafficking. Similar facts were sufficient to supply a nexus in *Bass*. *See id.* (Bass had frequently used a cell phone to communicate with co-conspirators and was using the phone to be searched when it was seized from him.).

In short, the warrant affidavit provided ample cause to support the search of Berry's phones for evidence of drug trafficking and firearms possession, even without the statements he challenges. But even if that probable cause was lacking, the good faith exception would apply.

"In *United States v. Leon*, the Supreme Court created an exception to the exclusionary rule for evidence 'seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. Gilbert*, 952 F.3d 759, 763 (6th Cir. 2020) (quoting *United States v. Leon*, 468 U.S. 897, 905 (1984)). "[E]vidence obtained pursuant to an invalid warrant

19

need not be suppressed 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Waide*, 60 F.4th 327, 341 (6th Cir. 2023) (quoting *Leon*, 468 U.S. at 920).  "But an officer does not act in objective good faith if the warrant is 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (quoting *Leon*, 468 U.S. at 923 (internal quotation marks omitted)).

To "avoid the bare-bones designation and thus be one upon which an officer can rely," the warrant affidavit "need only . . . establish a 'minimally sufficient nexus between the illegal activity and the place to be searched[.]'" *United States v. Christian*, 925 F.3d 305, 313 (6th Cir. 2019) (quoting *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016)).  The affidavit must "present 'some connection, regardless of how remote it may have been[.]'" *Id.* (quoting *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017)).  The affidavit here meets that requirement, even without the purportedly false or misleading statements.  Thus, officers reasonably relied on the warrant when searching the phones.

## IV. CONCLUSION

In short, the Court will deny Berry's motion to suppress evidence from the traffic stop. The police had reasonable suspicion to stop and detain Berry until the vehicle search was complete.  In addition, the police had probable cause to conduct the vehicle search.  The Court will also deny Berry's motion to suppress evidence obtained from the search of his phones.  He has not shown

that the temporary seizure of his phones at the traffic stop tainted the legal seizure of the phones

incident to his arrest.  Nor has he shown that the warrant to support that search was invalid.

An order will enter consistent with this Opinion.


Dated: July 6, 2026                                    /s/ Hala Y. Jarbou
                                                       HALA Y. JARBOU
                                                       CHIEF UNITED STATES DISTRICT JUDGE